**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

_____

| | | |
|---|---|---|
| **JAMES S. DEHART, et al.,** | : | **CIVIL ACTION** |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **HOMEQ SERVICING CORPORATION, et al.** | : | **No. 11-416** |
| **Defendants.** | : | |

_____ :

Goldberg, J.                                                                                    September 22, 2014

### <u>Memorandum Opinion</u>

On November 9, 2007, Plaintiffs' home was improperly sold at a sheriff's sale, on the mistaken understanding that Plaintiffs' mortgage obligations were in substantial arrears, and that an appropriate foreclosure judgment had been entered several years prior. On December 14, 2007, with the consent of the mortgage company, the sale of the home was set aside, and Plaintiffs were never removed from their home. This lawsuit contends that the Defendants[1], who are persons and entities involved in the servicing, lending, and foreclosure at issue, committed several torts and breached the mortgage agreement.

Currently before me is Defendants' motion for summary judgment. Despite having engaged in substantial discovery, Plaintiffs have failed to provide sufficient evidence that they were the victims of any torts, or that they suffered any damages from the breach of contract apart from any costs and fees associated with having the sheriff's sale set aside. Accordingly, and for reasons set forth below, I will grant Defendants' motion.

_____

[1] Defendants are: HomEq Servicing Corporation, Wells Fargo Bank, N.A., Wachovia Bank of Delaware, N.A., Milstead & Associates, LLC, Michael Milstead, and Greg Wilkins, who handled the foreclosure action.

## I.      Factual Background

The following facts are undisputed unless otherwise indicated:

On February 23, 1996, Plaintiffs James and Judy DeHart obtained a fixed-rate fifteen-year home loan at 10.25% interest in the amount of $126,400, secured by a mortgage on their property. (Wells Fargo MSJ, Ex. 1-2.) The note listed the monthly payment of principal and interest as $1,132.68. (Wells Fargo MSJ, Ex. 2.) The mortgage contained a paragraph requiring additional payments for, among other things, taxes and insurance:

> **2. Funds for Taxes and Insurance.** Subject to applicable law <u>or to a written waiver by Lender</u>, Borrower shall pay to Lender on the day monthly payments are due under the note, until the Note is paid in full, a sum ("Funds") for: (a) yearly taxes and assessments which may attain priority over this Security Instrument as a lien on the Property; . . . (c) yearly hazard or property insurance premiums . . . .

(Wells Fargo MSJ, Ex. 1 (emphasis added).) An additional term of the mortgage provided that the mortgage servicer would apply payments to taxes and insurance owed before any application to interest and principal. (Wells Fargo MSJ, Ex. 1.) Further, the mortgage required Plaintiffs to maintain property insurance, and indicated that if they did not, the Lender had the right to obtain insurance on its own, and that any premiums paid by the Lender in that manner would "become additional debt of Borrower secured by this Security Instrument" (Wells Fargo MSJ, Ex. 1, ¶ 7.):

> **5. Hazard or Property Insurance.** Borrower shall keep the Improvements now existing and hereafter erected on the Property insured against loss by fire, [certain defined hazards], and any other hazards . . . for which Lender requires insurance. . . . If Borrower fails to maintain the coverage described above, Lender may, at the Lender's option, obtain coverage to protect the Lender's rights in the Property.

(Wells Fargo MSJ, Ex. 1.)

Mr. DeHart testified that when he and his wife signed the note and mortgage, they also entered into an agreement with the Lender to waive the Paragraph 2 requirement that they make payments to the servicer to cover taxes and insurance. (Jam. DeHart Dep. 47:8-16.) Although

2

Mr. DeHart "imagine[d]" that such an agreement would probably be in writing, at the time of his deposition (March 20, 2013), he was still "in the process of trying to locate it." (Jam. DeHart Dep. 48:22-23, 50:1-4.) To date, neither party has identified a written waiver of the requirement.

It appears that for the first several years, Plaintiffs made their mortgage payments without incident. According to Mr. DeHart, "problems began" around November of 2000 when HomeEq Servicing Corporation became Plaintiffs' mortgage servicer. (Jam. DeHart Dep. 62:11-15; Wells Fargo MSJ, Ex. 20.) Around that time, HomEq began to add taxes into the payments of interest and principal, but Plaintiff was "never notified" of this action. (Jam. Dehart Dep. 62:15-21.) Plaintiffs also experienced a "lapse[]" in their homeowner's insurance (which they had secured and were paying for themselves) for about four months, at which time the servicer acquired insurance and began to charge Plaintiffs for the premium payments. (Jam. DeHart Dep. 63:5-18.) Mr. DeHart could not recall whether he received notice of the changes (he was later told that his monthly payment had increased by approximately $300 to account for the added taxes and insurance, (Jam. DeHart Dep. 67:1-8)), but he stopped sending mortgage payments for a couple of months because he did not receive monthly statements from HomEq, (Jam. DeHart Dep. 71:19 to 72:2). Plaintiffs then received an "Act 91" notice indicating that they were in default and that foreclosure proceedings would be initiated if the default was not cured. (Jam. DeHart Dep. 72:6-10.)

On October 31, 2001, a foreclosure complaint was filed against Plaintiffs in the Northampton County Court of Common Pleas. (Wells Fargo MSJ, Ex. 13.) According to the docket, Plaintiffs were served with the foreclosure complaint on December 11, 2001. (Wells Fargo MSJ, Ex. 13.) Plaintiffs never responded to the complaint, and a default judgment in the amount of $143,696.75 was entered on May 1, 2002. The law firm of Milstead and Associates, a

3

Defendant here, represented the Bank of New York in this foreclosure action. (Wells Fargo MSJ, Ex. 13.) A sheriff's sale of Plaintiffs' property was scheduled for July of 2002, but was averted when Plaintiffs' counsel filed a voluntary chapter 13 bankruptcy petition on June 21, 2002. (Mazaheri Dep. 114:19 to 115:7.)

After the bankruptcy case was dismissed on April 17, 2003, the bank filed a writ of execution in the Northampton County foreclosure matter, and a sheriff's sale of the property was again scheduled for September 5, 2003. (Wells Fargo MSJ, Ex. 6, 15.) Sometime before the sale, Plaintiffs made a payment of nearly $28,000 to reinstate their mortgage, and the sale was canceled.[2] (Jam. DeHart Dep. 100:23 to 101:4.)

Following the reinstatement, Plaintiff did not restart monthly payments. Mr. DeHart testified that the mortgage servicer was supposed to send Plaintiffs a coupon book or monthly statements, but that they received neither. (Jam. DeHart Dep. 124:6-11.) Because Plaintiffs did not know where to send their payments, Plaintiffs again missed several mortgage payments, and received another Act 91 notice of intent to foreclose in December 2003 indicating that they were three months delinquent on their payments, and quoting an amount of $4,758.49 to cure the default. (Jam. DeHart Dep. 124:12-19. Wells Fargo MSJ, Ex. 15.) Plaintiffs paid that amount. (Jam. DeHart Dep. 128:19-22.) When asked if monthly payments then resumed, Mr. DeHart responded: "They already started foreclosure proceedings on me. And after they stole so much money on me, the criminals that they are, I decided at that point from here on out my attorney

---

[2] There appears to be a factual dispute over when the agreement was reached to reinstate Plaintiffs' mortgage for the $28,000 figure. Mr. DeHart testified that the agreement was reached around the time the bankruptcy was dismissed, but the fact that a writ of execution was filed and a sheriff's sale was scheduled after the bankruptcy was dismissed suggests that payment came sometime later. (Jam. DeHart Dep. 103:14-23.)

will be handling this indefinitely, because I am not sending them anymore money, period, because they are thieves." (Jam. DeHart Dep. 130:20 to 131:1.)

HomEq filed a foreclosure complaint in the Northampton County Court of Common Pleas on March 17, 2004 (represented by Milstead and Associates), and Plaintiffs were served with the complaint on March 19, 2004. (Wells Fargo MSJ, Ex. 7.) Plaintiffs gave the complaint to their attorney, who they were "sure" would "file[] a response." (Jam. DeHart Dep. 132:19-22.) But Plaintiffs' counsel neither entered an appearance nor filed anything in response to the foreclosure complaint, and another default judgment was entered on September 29, 2004, in the amount of $137,543.58.[3] (Wells Fargo MSJ, Ex. 7.)

Plaintiffs did, however, file another voluntary chapter 13 bankruptcy petition on January 4, 2005, triggering an automatic stay of the foreclosure proceeding. (Wells Fargo MSJ, Ex. 8.);

---

[3] In a response to the Milstead Defendants' statement of undisputed facts noting that Plaintiffs' counsel filed nothing in Northampton County, but instead filed a bankruptcy petition on Plaintiffs' behalf, Plaintiffs' counsel wrote:

> Admitted. Only a FOOL would have given any thought to confidence in the Judicial System of Northampton County in 2004, what a joke. Even the Judges there today would tell you how they screwed things up back then. Plaintiffs' attorney went to the only capable court in the Country back then, the United States Bankruptcy Court. By filing with the Bankruptcy Court a Chapter 13, the Plaintiffs stopped all action, ALL ACTIONS, they weren't required to spend money they didn't have, all of their grievances were heard, all of the lies of the Defendants were ignored, and Plaintiffs had approximately $40,000.00 of improper fees and costs REMOVED from their mortgage balance!!! Not only that, Plaintiffs attorney had the entire reinstatement of the mortgage recorded, to avoid similar memory lapses from Milstead like in 2003, and all of the numbers went on the record with the lawyer from Udren's office verbally accepting the payment amount as full payment. Not that it had any effect on the foreclosure firm of Milstead & Associates.

This response is typical of Plaintiffs' counsel's advocacy. Between his two briefs opposing summary judgment, and his two responsive statements of fact, Plaintiffs' counsel has provided only a handful of citations to the record and attached only two exhibits.

11 U.S.C. § 362(a). Wachovia Bank of Delaware, N.A. filed a proof of claim in the bankruptcy action for $147,308.99. (In re DeHart, No. 05-20035, Doc. No. 26-2.) Of this amount, $119,262.33 was attributed to principal, $16,177.56 to interest, and the rest to attorney's fees and other items. (Id.) As of the date of the bankruptcy filing, Wachovia claimed $28,859.30 in arrearages, including $16,990.20 in missed monthly payments. (Id.) Plaintiffs objected on the grounds that the amount claimed was "excessive and unreasonable," and a hearing was scheduled. (In re DeHart, No. 05-20035, Doc. No. 46.)

Mr. DeHart testified at the bankruptcy hearing on May 4, 2006 that he "always" paid his property taxes and insurance on his own, and not to his mortgage servicer. (Wells Fargo MSJ, Ex. 9, at 6.) He further explained that the "house went into foreclosure, because . . . the payments that I was sending to the bank were not enough . . . because they were adding these insurance costs to my payments that I was unaware of and did not realize until a later date." (Wells Fargo MSJ, Ex. 9, at 7.) DeHart admitted on cross-examination that, at the time of the hearing, Plaintiffs had not made a mortgage payment in approximately a year. (Wells Fargo MSJ, Ex. 9, at 23.) At the conclusion of the hearing, the Bankruptcy Judge ruled from the bench that: (1) It was "inappropriate" for the bank to add insurance and tax payments to the mortgage payment, and that those amounts "need not be paid going forward"; (2) That the $28,000 payment made in late 2003 brought the DeHarts current on their mortgage through October 2003, and that the "bank's claim is equal to the principal amount that existed on October 1, 2003 . . . minus the principal amounts of all payments made after October 1, 2003 up to and including April, 2005" (when the DeHarts stopped making payments); (3) that the $4,758.49 payment made around December 2003 should be applied to reduce the principal; and (4) that no attorney's fees incurred by the bank after the $28,000 payment were to be included in the loan balance. ((Wells Fargo

6

MSJ, Ex. 9, at 41-51.) The Court did not reduce its bench order to a number, but instead asked the parties to reach an agreement as to the amount of the claim. (Wells Fargo MSJ, Ex. 9, at 51-52.)

That agreement was reached on the record on September 14, 2006. (Wells Fargo MSJ, Ex. 10.) Counsel for Wachovia announced that, as of October 2003, after subtracting the $4,758.49 payment, the principal amount was $113,630.72. (Wells Fargo MSJ, Ex. 10, at 5.) Counsel also noted that "subsequent to Your Honor's ruling, we struck out any sums for [insurance and taxes], for legal fees and costs and property inspection fees." (Wells Fargo MSJ, Ex. 10, at 5.) Finally, the parties agreed that the DeHarts owed $15,848.00 since they stopped making payments. (Wells Fargo MSJ, Ex. 10, at 6.) The DeHarts presented Wachovia with a cashier's check for that amount at the hearing, and the court dismissed the bankruptcy case. (Wells Fargo MSJ, Ex. 10, at 10-11.)

In a perfect world, that would have been the end of the matter. Plaintiffs and the bank had agreed, following the ruling of the bankruptcy court, that with the payment of $15,848.00, Plaintiffs had brought their mortgage current once again. But, information does not always travel swiftly and flawlessly from one entity to another. According to an affidavit submitted by the Wells Fargo Defendants, Wachovia sold "certain assets of HomEq Servicing Corporation . . . to Barclays Bank, PLC," effective November 1, 2006. (Weatherly Aff., at ¶ 11.) At the same time, HomEq Servicing (now a Barclays-owned company) assumed responsibility for servicing Plaintiffs' mortgage. (Weatherly Aff., at ¶ 19.) According to Mr. DeHart, from the time Plaintiffs' mortgage was brought current in Bankruptcy Court until September 2007 (approximately one year), he made all payments of principal and interest by certified check. (Jam. DeHart Dep. 162:15 to 163:3.) Nevertheless, Plaintiffs' September and October 2007

payments were returned with a notice that they were 22 months behind on their mortgage, and the payments were insufficient to bring the account current again. (Jam. DeHart Dep. 251:1-15.) At that point, Plaintiffs decided that they would not make any further payments. (Jam. DeHart Dep. 251:1-15.)

Milstead & Associates did not represent Wachovia in the bankruptcy proceedings. On August 10, 2007, the firm, representing HomEq, filed a praecipe for a writ of execution in the Northampton County Court of Common Pleas, seeking to schedule a sheriff's sale of Plaintiffs' home. (Wells Fargo MSJ, Ex. 7.) It appears that the basis for the request was the September 2004 default foreclosure judgment, which had never been formally vacated. On August 30, 2007, a notice of sheriff's sale was sent out, which Plaintiffs received in early September. (Jam. DeHart Dep. 203:3 to 204:16.) The notice indicated that the sale would occur on November 9, 2007. (Wells Fargo MSJ, Ex. 15.) Plaintiffs gave the notice to their attorney in mid- to late-September.[4] (Jam. DeHart Dep. 205:4-13.)

After receiving notice of the sheriff's sale, Plaintiffs did not file anything in the Northampton County Court of Common Pleas. (Mazaheri Dep. 93:4-13.) Instead, on November 6 or 7, 2007, two or three days before the scheduled sale, Plaintiffs' counsel called Milstead & Associates, where he spoke to Greg Wilkens, a paralegal. (Mazaheri Dep. 51:8-23.) Plaintiffs' counsel explained to Mr. Wilkens that it would be improper to go forward with the sheriff's sale, because Plaintiffs' were current on their mortgage payments following the ruling and agreement in bankruptcy court. (Mazaheri Dep. 63:6 to 64:17.) Plaintiffs' counsel testified that he "offered

---

[4] Plaintiffs' counsel could not remember the date he first saw the sheriff's sale notice, but seemed to contradict his client by saying it was "not much" before the scheduled sale on November 9, 2007. (Mazaheri Dep. 90:18-20.)

to fax" documentation supporting his position to the Milstead firm, but that Mr. Wilkens told him that he did not want to receive any documents. (Mazaheri Dep. 65:16 to 66:18.) Plaintiffs' counsel did not send the firm any of the documents in his possession, including anything related to the 2006 bankruptcy action.[5] (Mazaheri Dep. 72:9-23.) Mr. Wilkens told Plaintiffs' counsel that Milstead & Associates had "made a review of the file and our client has instructed us to proceed with the sheriff's sale." (Wilkens Aff., Ex. 1, at 264.)

Having not received the desired response from Milstead & Associates, Plaintiffs again sidestepped the Northampton County courts and filed a motion to reopen the bankruptcy proceeding, along with an application for a temporary restraining order to prevent the sheriff's sale. (In re DeHart, No. 05-20035, Doc. No. 80.) Milstead & Associates received the motion and supporting documents, and immediately commenced an investigation to determine whether there was merit to Plaintiffs' claim that the mortgage was current.[6] Mr. Wilkens specifically inquired to HomEq about the $15,848.00 payment made in the prior bankruptcy proceeding, and whether any of the funds were applied to escrow (taxes and insurance). (Wilkens Aff., Ex. 2, at 398.) The gist of HomEq's response was that the funds had been applied properly, and that the Plaintiffs' account remained significantly past-due. (Wilkens Aff., Ex. 2, at 396-98.) On the same day

---

[5] Mr. Wilkens, in an affidavit, testified that he "informed Plaintiffs' counsel that he could fax to my attention any relevant information with regard to Plaintiffs' account and that the firm would review the same." (Wilkens Aff., at ¶ 33.) Mr. Wilkens noted the conversation and his instruction to Plaintiffs' counsel to fax whatever documentation he had in the Milstead & Associates work journal on November 7, 2007. (Wilkens Aff., Ex. 1, at 264.)

[6] This investigation consisted almost entirely of communications between Milstead & Associates and its client, HomEq Servicing. These communications would normally be covered by the attorney-client privilege, but were produced by the Milstead Defendants under the "self-defense" exception to the privilege. To ensure that disclosure is no broader than necessary for the Milstead Defendants to defend themselves in this litigation, the Court entered a protective order covering the documents. (See Doc. No. 99.)

9

(November 9, 2007), the bankruptcy judge denied the motion to reopen, concluding that because the bankruptcy case had been dismissed (as opposed to closed), the court lacked jurisdiction. (In re DeHart, No. 05-20035, Doc. No. 82.) Plaintiffs' home was then sold at sheriff's sale to Defendants for $1 plus costs. (Wilkens Aff., Ex. 1, at 265.)

On November 14, 2007, Plaintiffs' counsel made his first appearance in the Northampton County foreclosure action, filing a petition to set aside the sheriff's sale. (Wells Fargo MSJ, Ex. 7.) Milstead & Associates, now seeing the transcript of the bankruptcy hearing—for the first time—advised HomeEq to consent to setting aside the sheriff's sale. (Wilkens Aff., Ex. 2, at 395.) On December 14, 2007, at a hearing in the Northampton County foreclosure action, HomEq did consent, and the sale was set aside. (Wells Fargo MSJ, Ex. 7; Mazaheri Dep. 105:18 to 106:21.) Plaintiffs were never removed from their home and, when asked if they had suffered any "out-of-pocket losses or financial losses" as a result of the sheriff's sale, Mr. DeHart testified that he "would have to probably say no to that." (Jam. DeHart Dep. 241:23 to 243:8.)

## II.     Discussion

Only two counts of Plaintiffs' amended complaint remain. The first is a breach of contract claim against Wells Fargo Bank; HomEq Servicing Corporation; and Wachovia Bank of Delaware, National Association (collectively, the "Wells Fargo Defendants"). The second is a claim for intentional infliction of emotional distress claim against Milstead & Associates, LLC, Michael J. Milstead, and Greg Wilkens (collectively, the "Milstead Defendants").

### A.     Summary Judgment Standard

Under Federal Rule of Civil Procedure 56(a), summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A party seeking summary judgment always bears the initial

responsibility of informing the court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Where the non-moving party bears the burden of proof on a particular issue at trial, the movant's initial Celotex burden can be met simply by "pointing out to the district court that there is an absence of evidence to support the non-moving party's case." Id. at 325. After the moving party has met its initial burden, summary judgment is appropriate if the non-moving party fails to produce sufficient evidence to allow a reasonable jury to return a verdict in its favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

### B.      Breach of Contract

To prove their claim for breach of contract under Pennsylvania law, Plaintiffs must show the existence of a contract, a breach of the contract, and damages. Spang & Co. v. U.S. Steel Corp., 545 A.2d 861, 866 (Pa. 1988); Reformed Church of Ascension v. Theodore Hooven & Sons, Inc., 764 A.2d 1106, 1109 (Pa. Super. Ct. 2000).

The Wells Fargo Defendants focus only on the last element, arguing that Plaintiffs have not shown that they suffered any damages relating to the alleged breach of the contract. A Plaintiff in a breach of contract case may be awarded any incidental damages that would naturally and ordinarily result from the breach, along with any consequential damages that were reasonably foreseeable and within the contemplation of the parties at the time they made the contract. Liss & Marion, P.C. v. Recordex Acquisition Corp., 983 A.2d 652, 662 (Pa. 2009). Additionally, in order to be recoverable, the existence of damages must be capable of proof to a reasonable certainty. Id. Although a lesser level of certainty is generally allowed as to the precise amount of damages, a plaintiff must still be able to "establish a basis for the assessment

11

of damages" to a "fair degree of probability." <u>Aiken Indus. v. Estate of Wilson</u>, 383 A.2d 808, 812 (Pa. 1978).

In its motion, the Wells Fargo Defendants analyze each of the eleven categories of damages Plaintiffs listed in an interrogatory response. Plaintiffs' response in opposition narrows these requests, eliminating those that involve emotional harm,[7] medical expenses, "lost opportunities due to a decade of torture by the Defendants," loss of consortium, and litigation costs "surrounding this case."[8] Instead, Plaintiffs seek attorney's fees incurred in dealing with the alleged breach of contract, compensation for damage to their credit, recovery for "misapplied" payments and "fraudulent" charges, as well as a declaration that the note is unenforceable and Plaintiffs owe nothing more. I will address these damage claims in reverse order.

---

[7] Generally speaking, damages for mental suffering are not recoverable in a breach of contract case, even when the damage is foreseeable. <u>Restatement (Second) of Contracts</u> § 353; <u>Rittenhouse Regency Affiliates v. Passen</u>, 482 A2d 1042, 1043 (Pa. Super. Ct. 1984). Although an exception might be recognized for extreme cases, it is only applicable where the conduct is so outrageous as to be actionable as the tort of intentional infliction of emotional distress. <u>See</u> <u>Rodgers v. Nationwide Mutual Ins. Co.</u>, 496 A.2d 881, 815-16 (Pa. Super. Ct. 1985) (noting that to support claim for emotional damage in contract case, defendant's conduct must be "something close to outrageous"); <u>Rittenhouse Regency</u>, 482 A.2d at 1043 (citing <u>Restatement (Second) of Torts</u> § 46 (1965) (defining IIED)). The conduct in this case, even if a breach of contract, does not meet this standard and, in any event, I previously dismissed the claims for emotional damages in connection with the breach of contract claims. (Doc. No. 51, at 7.)

[8] A party is generally not permitted to seek attorney's fees associated with a breach of contract action unless there is an express agreement to that effect. <u>Fidelity-Phila. Trust Co. v. Phila. Transp. Co.</u>, 173 A.2d 109, 113-14 (Pa. 1961). Plaintiffs failure to point to any applicable exception to the rule that parties bear their own attorney's fees led me to dismiss the claim for attorney's fees previously. (Doc. No. 51, at 7-8.) I will consider, however, whether any attorney's fees Plaintiff's incurred as a consequence of the alleged breach (not including this lawsuit) are potentially recoverable.

### 1.    Discharge of Mortgage Debt

A discharge of their mortgage debt is a remedy to which Plaintiffs are simply not entitled. Plaintiffs reached an agreement to bring the loan current at the September 14, 2006 bankruptcy hearing, at which time the unpaid balance was agreed to be $113,630.72. (Wells Fargo MSJ, Ex. 10, at 5.) Plaintiffs allege that they made payments through October of 2007, before being told their account was still in arrears. At that point, they stopped making payments and, so far as the record reflects, have not made a payment since. Plaintiffs have provided no evidence establishing that they paid off their mortgage, that the debt was forgiven, or that they have a legal right not to pay the remaining balance.[9]

### 2.    Fraudulent Charges and Misapplied Payments

Plaintiff also suggest that they have suffered damage from payments they have made that have not been properly credited, as well as from the payment of fees improperly charged by their mortgage servicer. Although Plaintiffs assert in their brief (without any citation to the record) that payments were "not properly credited" between "2003 up to the 2006 ruling of Judge Fehling," they elsewhere call the 2006 agreement in bankruptcy court a "full reinstatement" of the mortgage, suggesting that they viewed the agreed-upon figure of $113,630.72 to be the correct amount owed on the mortgage as of September 14, 2006. The transcript from the September bankruptcy hearing further confirms that Plaintiffs viewed the agreement as resolving all issues of crediting, arrearages, and payments:

> The Court: . . . [B]ased upon counsel's reviewing [the May 4th] order and
> reviewing the various components of that order and coming to an agreement on

---

[9] The only legal theory Plaintiffs proffer for this claim is the statute of limitations. But as Defendants correctly point out, the statute of limitations in Pennsylvania on an instrument under seal is 20 years. 42 Pa. Con. Stat. § 5529.

the numbers that flow out of that order so that the debtor's principal amount owing as of September 14, 2006 is $113,630.72. Counsel, is that correct?

Mr. Mazaheri: That's correct, Your Honor.

Ms. Myer Cohen: That's correct, Your Honor, pursuant to your May 4 order.

The Court: Pursuant to the May 4th order, and that the debtor currently owes arrearages pre-petition, post-petition and in all respects in the amount of $15,848 and no cents, is that correct, counsel?

Mr. Mazaheri: That's correct, Your Honor.

(Wells Fargo MSJ, Ex. 10, at 8.) Accordingly, if Plaintiff is to recover damages for improper crediting, it must be for the period following September 2006 (and ending November 2007, after which Plaintiffs concede they did not make or attempt to make any further payments).

As for "fraudulent" fees paid during the period between September 2006 and the November 9, 2007 foreclosure sale, Plaintiffs assert in their brief that "it is not and never has been required that Plaintiffs prove fraud when the evidence of said activities is intentionally withheld by Defendants." (Pl. Br. 17.) But this assertion is insufficient at the summary judgment stage, where discovery should have produced evidence of such charges. The only evidence Plaintiffs attach lists monthly property inspection charges of approximately $10.50 which, whether appropriate or not, all occurred after November 2007, when Plaintiffs acknowledge they had already stopped making any payments at all. This is insufficient to allow a jury to conclude to a reasonable certainty that Plaintiffs have suffered from any "fraudulent" charges or "misapplied" payments during the relevant period.

### 3.    Attorney's Fees

As mentioned above, Plaintiffs cannot recover attorney's fees incurred (if any) in prosecuting this action. Pennsylvania courts have "consistently followed the general, American

rule that there can be no recovery of attorneys' fees from an adverse party, absent an express statutory authorization, a clear agreement by the parties or some other established exception." Merlino v. Delaware Cnty, 728 A.2d 949, 951 (Pa. 1999). It is also well understood, however, that a party may recover losses that are incidental to the breach of contract. This includes "costs incurred in a reasonable effort, whether successful or not, to avoid loss." Restatement (Second) of Contracts § 347 cmt. c. (1981). This can include attorney's fees incurred to avoid further loss, such as when the breach of contract makes a lawsuit necessary to limit the damage to the non-breaching party. See Capitol Environmental Servs., Inc. v. Earth Tech, Inc., 25 So. 3d 593, 596-97 (Fla. App. 2009). It follows that the DeHarts would be entitled to recover damages to ward off Defendants' breaches, such as the cost to defend a wrongfully-brought foreclosure case, or the cost to set aside a wrongfully-instituted sheriff's sale.

But damages for setting aside the sheriff's sale does not necessarily include other steps Plaintiff's took to avert a foreclosure sale of their home, namely, the institution of two separate bankruptcy proceedings. The rule that consequential and incidental damages are recoverable in a breach of contract action is limited by another rule: a party may only recover damages that were a reasonably foreseeable consequence of a breach at the time the contract was made. Restatement (Second) of Contracts § 351(1); Delahanty v. First Pa. Bank, N.A., 464 A.2d 1243, 1258 (Pa. Super. Ct. 1983).

Various courts have considered whether expenses incurred in a bankruptcy are recoverable in a breach of contract action. For example, in In re Paragon Trade Brands, Inc., the bankruptcy court found that it was foreseeable that the defendant's breach of a warranty, which had the effect of shifting almost $200 million dollars in damages to a newly-formed corporation, would lead to bankruptcy, and thus held those damages recoverable. 324 B.R. 829, 911 (Bankr.

15

N.D. Ga. 2005), rev'd sub nom. on other grounds, Weyerhaeuser v. Lambert, 2007 WL 2826957 (N.D. Ga. 2007). A different bankruptcy court, faced with a claim that failure to make payment under a construction contract had driven the contractor into bankruptcy, refused to permit an award of bankruptcy-related damages to the contractor. In re Constr. Diversification, Inc., 36 B.R. 434, 439 (E.D. Mich. 1983). Even though the contractor presented evidence tending to show that the defendant knew the contractor was financially unstable, and that failure to make payment would increase the risk of bankruptcy, the court concluded that awarding such damages would be bad public policy, and make it more difficult for small contractors (who might be more likely to go bankrupt) to attract business. Id. at 438-39. Finally, in Ramsey v. United States, the Court of Claims concluded that the plaintiff could not recover bankruptcy-related costs attributable to the government's late payment on a contract, because "[t]hat the nonpayment of the contract price of the two contracts would put the corporation on the brink of bankruptcy could not have been reasonably foreseen by the Government." 101 F. Supp. 353, 433 (Ct. Cl. 1951); see also Roberts v. United States, 18 Cl. Ct. 351, 358 (Cl. Ct. 1989) (calling bankruptcy-related expenses "consequential damages" that "cannot be recovered unless plaintiffs can establish that they were foreseeable when the parties entered into the implied-in-fact contract").

Here, Plaintiffs have produced no evidence that would suggest that it was foreseeable that foreclosure on their home would result in their filing for bankruptcy. Each of the cases above involved situations in which the plaintiff was expecting to receive income (or at least not be burdened with liabilities), but was denied that opportunity by the breach of contract. When the breach foreseeably denies the plaintiff a substantial stream of income, it makes sense that bankruptcy might sometimes follow. But here, although Plaintiffs may have seen bankruptcy as a valuable tool for avoiding the foreclosure sale of their home, they have produced no evidence to

support the required causal connection between the efforts of the Wells Fargo Defendants to foreclose, and fees incurred in filing for bankruptcy. Thus, I conclude as a matter of law that Plaintiff cannot recover these costs as damages.[10]

That leaves attorney's fees incurred in moving to set aside the sheriff's sale in Northampton County (a motion that was assented to by Defendants). These damages, though likely small in amount, would be a direct consequence of the breach (the breach being the inappropriate sheriff's sale itself). See In re Pennsylvania Footwear Corp., 204 B.R. 165, 182 (Bankr. E.D. Pa. 1997) (allowing recovery of attorney's fees incurred in setting aside sheriff's sale caused by breach). At this stage, I decline to grant summary judgment to the Wells Fargo Defendants as to these damages, because I conclude that they are recoverable if proven. I stress that Plaintiff is limited to damages incurred in responding to the sheriff's sale which, so far as the record discloses, includes only costs and fees associated with preparing and presenting the petition to set aside the sale, and for attending the hearing at which Defendants' assented to the relief that Plaintiffs' sought. See id. (allowing recovery for $3,500 in attorney's fees "incurred in attempting to undo the sale"). Thus, as to the Wells Fargo Defendants, the motion for summary judgment will be denied in part.

---

[10] I need not deal separately with Plaintiffs' claim that they are entitled to damages for the harm done to their credit. Plaintiffs' only evidence that their credit was harmed is an application for a $2,500 loan that was denied. According to James DeHart, he applied for the loan "just to see if I could get a small personal loan." (Jam. DeHart Dep. 55:8-10.) He further testified that the reason for the denial was the "bankruptcies on [his] credit report." (Jam. DeHart Dep. 56:11.) My conclusion that the bankruptcies themselves were not sufficiently connected to Defendants' breach to make the costs incurred in them recoverable necessarily extends to any damage to Plaintiffs' credit that resulted from those bankruptcies.

### C.      Intentional Infliction of Emotional Distress

Plaintiffs' final claim is that the conduct of the Milstead Defendants described above amounts to intentional infliction of emotional distress.

Although Pennsylvania courts have not explicitly adopted the definition of intentional infliction of emotional distress (IIED) found in the Restatement, the Third Circuit has concluded that it "may be applied as the basis in Pennsylvania law for the tort" of IIED. Chuy v. Phila. Eagles Football Club, 595 F.2d 1265, 1274 (3d Cir. 1979).   According to the Restatement (Second) of Torts § 46 (1965):

> One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm.

In order to recover, a plaintiff must prove four elements: (1) extreme and outrageous conduct; (2) that is intentional or reckless; (3) emotional distress resulting from the conduct; (4) that the emotional distress is severe. Bruffett v. Warner Commc'ns, Inc., 692 F.2d 910, 914 (3d Cir. 1982).

The conduct requirement for IIED is stringent, and can be satisfied by "only the most egregious conduct." Hoy v. Angelone, 720 A.2d 745, 754 (Pa. 1998). The type of conduct necessary to succeed has been variously described as "extreme and clearly outrageous," id., "clearly desperate and ultra extreme," id. at 754, "intentional, outrageous, and wanton," Papieves v. Lawrence, 263 A.2d 118, 121 (Pa. 1970), and "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community," Restatement (Second) of Torts § 46, cmt. d. These standards are meant to convey that IIED liability does not extend to "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities," even when those actions are done

18

with an intent that could be described as criminal or malicious. <u>Restatement (Second) of Torts</u> § 46, cmt. d.

The cases that have been held to present circumstances sufficient to move past a dispositive motion reflect the rarity of the situations in which this tort may properly be invoked. In <u>Banyas v. Lower Bucks Hospital</u>, for example, the defendant hospital negligently caused a patient's death, but wrote in medical records that the death was entirely due to injuries inflicted by the plaintiff (who had been in a fight with the patient). 437 A.2d 1236, 1237-38 (Pa. Super. Ct. 1981). As a result, the plaintiff was charged with murder, among other crimes. <u>Id.</u> at 1238. The court held that those allegations stated a claim for IIED. And in <u>Chuy</u>, a team doctor for the Philadelphia Eagles told the press that a player was afflicted with a fatal blood disease, while knowing that the player was not actually so afflicted. 595 F.2d at 1275-76. The court upheld the jury's IIED verdict against the Eagles. <u>Id.</u> at 1276.

In the foreclosure context, courts have been reluctant to find the level of outrageousness necessary to support a claim for IIED. For example, in <u>Wilson v. American General Finance, Inc.</u>, the plaintiff alleged that a mortgage servicer falsely told her on several occasions that her account was delinquent, and also distributed this false information to third parties. 807 F. Supp. 2d 291, 293 (W.D. Pa. 2011). The court acknowledged that while these actions might be "libelous," "offensive," and "undesirable," it did not rise to the necessary level for an IIED claim. <u>Id.</u> at 303-04. In <u>Clay v. Option One Mortgage Corp.</u>, where the mortgagee falsely listed the plaintiff as the mortgagor in a sheriff's sale advertisement, the court concluded that the conduct was insufficiently outrageous to support an IIED claim. 2007 WL 2728972, at *4 (E.D. Pa. Sept. 18, 2007). Finally, in <u>Jones v. Nissenbaum, Rudolph and Seidner</u>, a law firm told the plaintiffs in front of a neighbor that their house would be sold at sheriff's sale and that "they

would have 30 days to get their junk out," even though the law firm knew that the sale could not go forward without a hearing and a revival of the judgment. 368 A.2d 770, 771-74 (Pa. Super. Ct. 1976). The court noted that, although these actions might be "insulting and embarrassing," they were not outrageous enough for an IIED claim. Id. at 384.[11]

Here, the undisputed facts reflect that Plaintiffs' evidence for their IIED claim falls far short of the mark.[12] The evidence, unopposed by Plaintiffs, shows that after receiving a telephone call from Plaintiffs' counsel, along with Plaintiffs' motion to reopen their bankruptcy proceeding, Milstead & Associates inquired to its client about the propriety of the sheriff's sale, and only proceeded upon assurances that Plaintiffs' account still carried significant arrears. And following the sheriff's sale, upon receipt of the motion to set aside the sale, the firm recognized that an error had been made, and advised its client to consent to the relief Plaintiffs' sought. Whether the pre-sale investigation was sufficient, whether the Milstead Defendants should have recognized something was awry, or whether the reliance on its client's assurances of a continuing past-due balance was reasonable is beside the point. Even if the Milstead Defendants were negligent or reckless in failing to discover the bankruptcy action and the agreement bringing the mortgage current, their conduct, as reflected in the summary judgment record, falls far short of reaching the level of extreme and outrageous.

---

[11] See also Akar v. Fed. Nat'l Mortg. Ass'n, 845 F. Supp. 2d 381, 385 (D. Mass. 2012) (dismissing IIED claim where bank sold home at foreclosure sale after repeatedly assuring homeowners that the sale would be postponed); Brown v. Udren Law Offices PC, 2011 WL 4011411, at *1-4 (E.D. Pa. Sept. 9, 2011) (dismissing IIED claim where law firm proceeded with sheriff's sale after withdrawing foreclosure judgment); Book v. Mortg. Elec. Registration Sys., 608 F. Supp. 2d 277, 289-90 (D. Conn. 2009) (dismissing IIED claim where purchaser at sheriff's sale sent homeowner a sarcastic sympathy card, told him they were watching the property, and threatened him by saying that he would end up in a dumpster if he was not careful).

[12] As I noted above, Plaintiffs have not attached a single piece of evidence to their submissions in opposition to the Milstead Defendants' motion for summary judgment.

And that is not the only problem with Plaintiffs' IIED claim. In order to prove the severe emotional distress contemplated by the third and fourth elements of the tort, Pennsylvania requires a plaintiff to provide "expert medical confirmation that the plaintiff actually suffered the claimed distress." Kazatsky v. King David Mem'l. Park, Inc., 527 A.2d 988, 995 (Pa. 1987). The scheduling order in this case provided that Plaintiffs were to serve their expert reports by June 21, 2013, and that all expert discovery was to conclude by August 16, 2013. Plaintiffs have not provided the Court with any expert reports in its opposition to summary judgment. Accordingly, under Pennsylvania law, they cannot make out a claim for IIED. Summary judgment will be granted to the Milstead Defendants.

**III.     Conclusion**

This is an unfortunate case. The record reflects a great deal of confusion regarding whether and to what extent the DeHarts fell behind on their mortgage. It further reflects an inappropriate foreclosure sale—later set aside with the agreement of the Defendants—an event that no doubt caused the DeHarts significant stress. Beyond costs and fees associated with setting aside the sale, however, Plaintiffs and their counsel have failed to marshal facts showing that they suffered any reasonably certain, quantifiable loss. And that is their burden at the summary judgment stage. Accordingly, summary judgment must be granted in part to the Wells Fargo Defendants. The Milstead Defendants cannot be held liable on this record for intentional infliction of emotional distress.

An appropriate order follows.